## MASON *v.* ERVINE and others.[1]

*(Circuit Court, E. D. Louisiana. March 6, 1886.)*

1. PILOTS—BRANCH PILOTS OF THE PORT OF NEW ORLEANS.
    The Association of Branch Pilots of the port of New Orleans does not constitute what is known in Louisiana as a commercial partnership, in which the partners are liable to their creditors *in solido.*

2. SAME.
    Said association is not an insurer of the experience, skill, judgment, or conduct of any of its members, and therefore, when without fault itself, it is not liable for the negligence, want of skill, or fault of any Branch Pilot, belonging to the association, resulting in damage to any vessel that such pilot may undertake to pilot into the Mississippi river from the sea.

3. SAME.
    When a pilot, in piloting a vessel, has used his best skill and judgment, he is not liable for her loss, although the result shows that his best judgment was wrong.

Admiralty Appeal.

*O. B. Sansum,* for libelant and appellant.

*I. R. Beckwith,* for defendants and appellees.

PARDEE, J. This cause came on to be heard and was argued, and thereupon the court does find as the facts in the case as follows:

(1) That the steam pilot-boat Underwriter was, on the nineteenth October, 1883, owned by John Ervine and other defendants named in the libel, with the exception of John Westerfield; that under the provisions of section 2707 of the Revised Statutes of the State of Louisi-

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

ana the Branch Pilots of the Port of New Orleans were associated in one voluntary association, as authorized by said section, and as set forth in the articles of association, a copy of which is attached to the libel in the cause, marked "Exhibit A." and made part of these findings; that the owners of the steam pilot-boat Underwriter named in the libel, while members of the association did not constitute the entire Association of Branch Pilots of the Port of New Orleans, there being Associated Branch Pilots not named in the libel, and who were not owners in the Underwriter; that the Association of Branch Pilots of the Port of New Orleans, Louisiana, as disclosed in the documents and proofs in the record is not a commercial firm under the laws of the state of Louisiana, and was not on the nineteenth October, 1883, or when this suit was brought.

(2) That on the nineteenth day of October, 1883, the brig Helen H. Monroe, bound on a voyage from Philadelphia to the port of New Orleans, laden with a cargo of coals, reached the offing at the mouth of the Mississippi river, and signaled for a pilot; that the Helen H. Monroe was of about 453.55 tons burden, and in rig a hermaphrodite brig; that she was heavily laden with coals, having only about one foot freeboard in the waist, having laden to about one foot of her decks at that point, and having about 11 feet depth of hold, and was drawing at the time $16\frac{1}{2}$ feet; that at the time of signaling for a pilot the vessel was distant from the seaward mouth of the jetties about six or seven miles to southward and westward of the mouth of the jetties, with the wind blowing about southeast a wholesale breeze,— that is, a breeze that would carry all her canvas.

(3) That the jetties are constructed in what is known at the "South Pass of the Mississippi River," and at the seaward end consist of two parallel artificial works or embankments, extending from the land out seaward; that the original parallel embankments extending into the sea are located and constructed parallel, and about 1,000 feet apart; that subsequent to the location and construction of the original jetty-banks the channel between the jetties was constricted by lateral wing-dams, nearly at right angles to the original jetty-walls, until the actual channel between the ends of the wing-dams is about 630 feet; that this was the condition and state of the wing-dams generally on the nineteenth day of October, 1883; that the extreme end of the jetties seaward had a curvature to the westward; that the length of the artificial jetties, at the point where the east jetty commences, extends seaward about 11,000 feet; that the seaward end or entrance to the jetties is constricted and obstructed by a solid wing-dam, extending from the seaward end of the easterly jetty towards the center of the channel, and but a short distance above that is a wing-dam extending eastward from the west jetty, narrowing the entrance to about 630 feet; that seaward, and southerly from the mouth of the jetties, lying nearly in the line of the center of the channel of the jetties, is a mud lump or sand bar, having a variable

depth of water, sometimes as shallow as 11 feet, but averaging, according to the state of the water, to about 14 feet; that the affect of this obstruction, at that time, was to establish, by dividing the current, two channel-ways, through which vessels drawing 16 feet of water could pass, to enter or leave the jetties; that one of the channels was known as the "Western Channel," passing to the westward of the middle obstruction, having at that time an average depth of twenty feet, an average width of from two to three hundred feet, and in a direction nearly in a line with the direction of the channel within the jetty-walls; that the outer channel, commonly known as the "Eastern Channel," turns around the seaward end the eastern jetty, passing between that end of the jetty and the middle ground, lump, or shoal, and trending eastward, having an average depth at that time of about 26 feet; that the current between the jetty-walls and in the two sea-channels was, at that time, from three and a half to four miles an hour.

(4) That when a vessel enters the jetties by the eastern channel, and passes her bow beyond the end of the lower wing-dam on the eastern side of the jetties, the downward current through the jetties strikes her starboard bow with full force, and in order to make the turn necessary to place the ship in the middle of the space between the wing-dams, and in the direction of the channel between the jetties, it is necessary that she should be under such control, and so answer her helm with certainty, as to be able to make a quick turn and change of direction against the downward pressure of the current on her starboard bow, because, in case of failure to respond quickly to her helm, the vessel is in danger of running across, and striking the artificial works or wing-dams of the western jetty, or of sweeping back down, either on the middle ground, or on the westward bank of the western channel; that from the constricted space within which the above maneuver has to be made, it is extremely difficult to navigate a vessel propelled by sail, into the jetties through this eastern channel; that the western channel being more nearly in prolongation of the axis of the jetties, and its current being more nearly in the direction of the current between the jetties, presents less difficulty for the navigation of a vessel propelled by sail, drawing less than the depth of water in the channel; that the pilot, John Nichols, was a competent, skillful, and experienced pilot, and had a knowledge of these facts.

(5) That when the brig Helen H. Monroe was sighted, and her signal for a pilot seen from the steam pilot-boat Underwriter, at that time cruising off the mouth of the jetties, she ran down to the brig, and the pilot John Nichols was put on board of the brig; that, as soon as he boarded the vessel, a signal flag was set for the services of a steam tow-boat; that the vessel at that time being to the westward of the entrance of the western channel, and no steam tow-boat responding to the signal, the said pilot, John Nichols, concluded to

enter the jetties by the western channel,—the position of the vessel, and the direction of the wind and the state of the weather leading him to that conclusion and judgment; that, to accomplish this end, the vessel being hove to when he boarded her, he caused her to fill away, and stand on a north-easterly course until she had made easting enough to open fairly the western channel; that when she had reached that point, and had opened the channel, he caused the vessel to be put on a course necessary to take her through the western channel; that at this time, and while the vessel was on this course, the wind was fair, being abaft the beam, and the vessel had the following canvas on: She was under reefed mainsail, middle staysail, lower topsail, upper topsail, (the upper topsail being split in the seam the whole depth of the sail.) She had two jibs on the boom, and a foretop-mast staysail. The pilot caused the reef to be taken out of the mainsail; dropped the foretop-mast staysail; set the foretop-gallant-sail; this change of the forward sail being made on account of the non-serviceable character of the split upper foretopsail.

(6) That the brig was constructed with a house on deck, abaft the mainmast, extending nearly to the rail on each side, and about five feet high; the wheel was located abaft the house, which extended very nearly to the stern, leaving a small space for the steering gear; that forward was another house constructed on the deck, used as a forecastle and galley, higher than the after-house, and about ——— feet high; that in order to cond the vessel and keep the shore ranges, the pilot was compelled to stand on the top of the after-house, and get and keep his shore ranges by looking through under the leech of the foresail, and was unable to perform his duty and personally inspect the action of the men at the wheel, the wheel being behind him.

(7) That as soon as the pilot had put the vessel on the proper course to pass up through the western channel, he discovered that the vessel steered badly, and did not respond to the helm ordered, whereupon he complained to the master of the bad steering, and the master himself went aft, and joined the man at the wheel, there being but one man at the wheel before that time; that after the master went to the wheel there was no improvement in the steering of the vessel, the vessel continuing to fall off too much to the westward. The master then stated to the pilot that the vessel steered badly because she had too much canvas on, and that the mainsail should be taken off; and, the vessel still falling off to the westward, the pilot took off the mainsail, and almost immediately the brig grounded on the western side of the western channel, about 400 feet to the seaward, and southward of the seaward end of the western jetty.

(8) That if the vessel had responded to her helm as ordered by the pilot she would not have grounded on the western side of the channel.

(9) That when the vessel struck the ground she lost her way, and became fast; that the steam pilot-boat Jennie Wilson, belonging to the entire pilot association, ran down to her, and attempted to pull her off, but failed.

(10) That, after the vessel struck, the wind (continuing from east to south-east) increased somewhat in violence, sufficient to cause combing and breakers on the western bank of the western channel, where the vessel lay, and the waves broke over the vessel's decks.

(11) That, shortly after the vessel struck, the master ordered off a portion of the fore-hatch, and shortly afterwards left the vessel; that the master's reason, as assigned by him, for opening the fore-hatch, was an alleged apprehension on his part that the vessel might open her seams, take in water, and by the compression of the air burst her decks; that the result of opening the fore-hatch was that the sea breaking over the vessel ran over the combing of the hatch into the hold, and filled the vessel with water.

(12) That while the master left the vessel, shortly after she struck, the pilot John Nichols remained on board all night, and that before morning the vessel was full of water, and the vessel became a total wreck.

(13) That no pilotage dues for piloting the brig were ever collected or distributed to the pilots' association, and that the defendant John Ervine received no manner of benefit from the pilotage of the Helen H. Monroe.

(14) That in his attempt to pilot the brig into the port of New Orleans, the said pilot, John Nichols, exercised his best judgment, skill, and discretion in directing and piloting the vessel, and that the said vessel went aground, and the said vessel and cargo became a total wreck, by reason of the narrow channel of the jetties, the rapidity of the current therein, the fault of the vessel in not answering her helm, combined with the exercise of mistaken judgment of the pilot John Nichols in allowing the mainsail to be lowered, and to that extent the said vessel and cargo became a total wreck by a peril of the sea.

(15) That the master was part owner of the said brig, and that his interests in the freight money and cargo were insured, and the said brig and cargo were insured for the owners, and all the said insurance has been paid by the insurers as a total loss by a peril of the sea.

(16) That the value of the said brig was $12,000, the freight was worth $2,200, and the cargo was worth $2,500.

And the court does find as conclusions of law, as follows:

(1) That the said Association of Branch Pilots did not and does not constitute what is known in Louisiana as a commercial partnership, in which the partners are liable *in solido.*

(2) That the said association is not an insurer of the experience, skill, judgment, or conduct of any of its members, and therefore, when without fault itself, it is not liable for the negligence, want of skill, or faults of any Branch Pilot belonging to the association, resulting in

damage to any vessel that such pilot may undertake to pilot into the Mississippi river from the sea.

(3) That said John Nichols, having, in piloting the said brig, used his best skill and judgment, is not liable for the loss of the said brig and cargo, although the result shows that his best judgment was wrong.

(4) That the libel ought to be dismissed.